IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

SHERA MEGAN STEERE,

        Claimant,

vs.

KILOLO KIJAKAZI,
ACTING COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.

No. 20-CV-2077-LRR

**REPORT AND
RECOMMENDATION**

_____

     Shera Megan Steere ("Claimant) seeks judicial review of a final decision of the Commissioner of Social Security ("the Commissioner") denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. Sections 401-34. For the reasons that follow, I respectfully recommend that the Commissioner's decision be **affirmed**.

## I.    BACKGROUND

     I adopt the facts set forth in the Parties' Joint Statement of Facts (Doc. 18) and only summarize the pertinent facts here. Claimant was born March 14, 1978. (AR[1] at 18.) Claimant has at least a high school education and is able to communicate in English. (*Id.* at 19.) She allegedly became disabled due to major depressive disorder, general anxiety, anemia, and hypothyroidism. (*Id.* at 186.) Claimant's onset of disability date was August 1, 2016. (*Id.* at 10.) Claimant filed her application on February 9, 2018.

---

[1] "AR" cites refer to pages in the Administrative Record.

Case 6:20-cv-02077-LRR-MAR    Document 25    Filed 04/22/22    Page 1 of 56

(*Id.*)  Her claim was denied originally and on reconsideration.  (*Id.* at 74-77, 83-86.)  A video hearing was held on October 3, 2019, with Claimant and her attorney Hugh M. Field in Waterloo, Iowa and ALJ Tom Andrews in West Des Moines, Iowa.  (*Id.* at 28.) Vocational expert ("VE") Vanessa J. May also appeared.   (*Id.*)  Claimant and the VE testified.  (*Id.* at 34-51.)   The ALJ issued an unfavorable decision on November 21, 2019.  (*Id.* at 10-20.)

Claimant requested review and the Appeals Council denied review on June 19, 2020.  (*Id.* at 1-4.)  Accordingly, the ALJ's decision stands as the final administrative ruling in the matter and became the final decision of the Commissioner.  *See* 20 C.F.R. § 416.1481.

On  October 5, 2020, Claimant timely filed her complaint in this Court.  (Doc. 4.)  On November 10, 2021, all briefing was completed, and the Honorable Linda R. Reade referred the case to me for a Report and Recommendation.

## II.    *DISABILITY DETERMINATIONS AND THE BURDEN OF PROOF*

A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A claimant has a disability when, due to physical or mental impairments, the claimant

> is not only unable to do [the claimant's] previous work but cannot, considering [the claimant's] age, education, and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).  A claimant is not disabled if the claimant is able to do work that exists in the national economy but is unemployed due to an inability to find work, lack of options in the local area, technological changes in a particular

2

industry, economic downturns, employer hiring practices, or other factors.  20 C.F.R. § 404.1566(c).

To determine whether a claimant has a disability, the Commissioner follows a five-step sequential evaluation process.  *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003).  At steps one through four, the claimant has the burden to prove he or she is disabled; at step five, the burden shifts to the Commissioner to prove there are jobs available in the national economy.  *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009).

At step one, the ALJ will consider whether a claimant is engaged in "substantial gainful activity."  *Id.*  If so, the claimant is not disabled.  20 C.F.R. § 416.920(a)(4)(i). "Substantial activity is significant physical or mental work that is done on a full- or part-time basis. Gainful activity is simply work that is done for compensation."  *Dukes v. Barnhart*, 436 F.3d 923, 927 (8th Cir. 2006) (citing *Comstock v. Chater*, 91 F.3d 1143, 1145 (8th Cir. 1996); 20 C.F.R. § 416.972(a),(b)).

If the claimant is not engaged in substantial gainful activity, at step two, the ALJ decides if the claimant's impairments are severe.  20 C.F.R. § 416.920(a)(4)(ii).  If the impairments are not severe, then the claimant is not disabled.  *Id.*  An impairment is not severe if it does not significantly limit a claimant's "physical or mental ability to do basic work activities."  *Id.* § 416.920(c).  The ability to do basic work activities means the ability and aptitude necessary to perform most jobs.  *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987) (quoting 20 C.F.R. §§ 404.1521(b), 416.921(b)).  These include

> (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.

*Id.* (quotation omitted) (numbers added; internal brackets omitted).

3

If the claimant has a severe impairment, at step three, the ALJ will determine the medical severity of the impairment. 20 C.F.R. § 416.920(a)(4)(iii). If the impairment meets or equals one of the impairments listed in the regulations ("the listings"), then "the claimant is presumptively disabled without regard to age, education, and work experience." *Tate v. Apfel*, 167 F.3d 1191, 1196 (8th Cir. 1999) (quotation omitted).

If the claimant's impairment is severe, but it does not meet or equal an impairment in the listings, at step four, the ALJ will assess the claimant's residual functional capacity ("RFC") and the demands of the claimant's past relevant work. 20 C.F.R. § 416.920(a)(4)(iv). RFC is what the claimant can still do despite his or her limitations. *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) (citing 20 C.F.R. §§ 404.1545(a), 416.945(a)). RFC is based on all relevant evidence and the claimant is responsible for providing the evidence the Commissioner will use to determine the RFC. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). "Past relevant work" is any work the claimant performed within the fifteen years prior to this application that was substantial gainful activity and lasted long enough for the claimant to learn how to do it. 20 C.F.R. § 416.960(b)(1). If a claimant retains enough RFC to perform past relevant work, then the claimant is not disabled. *Id*. § 416.920(a)(4)(iv).

At step five, if the claimant's RFC will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to show there is other work the claimant can do, given the claimant's RFC, age, education, and work experience. *Id*. §§ 416.920(a)(4)(v), 416.960(c)(2). The ALJ must show not only that the claimant's RFC will allow the claimant to do other work, but also that other work exists in significant numbers in the national economy. *Eichelberger*, 390 F.3d at 591 (citation omitted).

## A.    *The ALJ'S Findings*

As a threshold issue, the ALJ found that Claimant met the insured status requirements of the Social Security Act through March 31, 2017. (AR at 12.)

The ALJ then made the following findings regarding Claimant's disability status at each step of the five-step process. At step one, the ALJ found that Claimant had not engaged in substantial gainful activity from her alleged onset of disability date of August 1, 2016 through her last date insured ("LDI") of March 31, 2017. (*Id.*)

At step two, the ALJ found that Claimant suffered from the following severe impairments: borderline personality disorder, major depressive disorder, and generalized anxiety disorder/social phobia. (*Id.*) The ALJ found Claimant's obesity, anemia, and hypothyroidism were nonsevere impairments. (*Id.* at 12-13.) The ALJ considered the effects of Claimant's obesity not only under the listings, but also when assessing other steps of the sequential evaluation process. (*Id.*) The ALJ stated that Claimant was noted to walk without difficulty, went to the gym three times a week, and was contemplating training for a 5K. (*Id.*) The ALJ also found that Claimant's anemia was being treated with medication and her last thyroid test was within the normal range. (*Id.* at 13.) Therefore, the ALJ found Claimant had no severe physical impairments.[2] (*Id.*)

At step three, the ALJ found that Claimant did not have an impairment or combination of impairments that met or equaled a presumptively disabling impairment listed in the regulations, either when considered singly or in combination. (*Id.*) The ALJ evaluated Claimant's mental impairments under listings 12.04 (depressive, bipolar and related disorders) and 12.06 (anxiety and obsessive compulsive disorders). (*Id.*)

At step four, the ALJ found that Claimant had the following RFC:

[T]he claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: can have no more than occasional interaction with the general public, co-workers, and supervisors; work itself largely deals with things, rather than people, throughout a typical workday; no transaction interactions, eg [sic] sales, negotiation, customer service, resolution of

---

[2] Claimant does not appeal this finding.

disputes; no more than occasional simple work related decision [making skills] or independent judgment skills; no more than occasional changes in the general nature of the work setting and the tasks to be performed; limited to work capable of being performed by someone able to understand, remember and carry out routine, repetitive work tasks; work performed at no more than a regular pace-for instance, no fast paced production type work, piece work, or assembly line work.

(*Id.* at 13-14.) The ALJ also found that Claimant was unable to perform any of her past relevant work. (*Id.* at 18.) At step five, the ALJ found there were jobs that existed in significant numbers in the national economy Claimant could perform, including kitchen helper, laundry worker, and retail marker. (*Id.* at 19.) Therefore, the ALJ concluded that Claimant was not disabled. (*Id.* at 20.)

## B.     *The Substantial Evidence Standard*

The ALJ's decision must be affirmed "if it is supported by substantial evidence on the record as a whole." *Moore*, 572 F.3d at 522. "The phrase 'substantial evidence' is a 'term of art' used throughout administrative law. . . . [T]he threshold for such evidentiary sufficiency is not high. . . . It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations and quotations omitted). Thus, a court cannot disturb an ALJ's decision unless it falls outside this available "zone of choice" within which the ALJ can decide the case. *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006) (citation omitted). The decision is not outside that zone of choice simply because the court might have reached a different decision. *Id.* (citing *Holley v. Massanari*, 253 F.3d 1088, 1091 (8th Cir. 2001)); *Moore*, 572 F.3d at 522 (holding that the court cannot reverse an ALJ's decision merely because substantial evidence would have supported an opposite decision).

In determining whether the Commissioner's decision meets this standard, the court considers all the evidence in the record, but does not reweigh the evidence. *Vester v.*

*Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005). A court considers both evidence that supports the ALJ's decision and evidence that detracts from it. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). The court must "search the record for evidence contradicting the [ALJ's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)).

### III.   DISCUSSION

Claimant alleges the ALJ committed reversible error by (A) failing to fully and fairly develop the record; (B) failing to articulate sufficient reasons for how persuasive he found counselor Gretchen Honsell's opinion; (C) failing to articulate sufficient reasons for how persuasive he found Dr. Rathe's opinion; and (D) failing to properly evaluate Claimant's subjective complaints. (Doc. 19 at 1.)

### A.   Whether the ALJ Fully and Fairly Developed the Record

#### 1.   Relevant Background Facts

On April 24, 2018, SSA requested records from Ms. Gretchen Honsell, Claimant's mental health counselor at the University of Northern Iowa ("UNI"), where Claimant had been a graduate student from 2015-2017. (AR at 603.) The request asked Ms. Honsell to provide a report discussing Claimant's remaining work-related abilities despite the limitations of her impairment. (*Id.*) The report was to include therapy notes and was to cover the period from December 2013 to March 2017. (*Id.*)

Ms. Honsell's May 7, 2018 report consisted of a letter ("Ms. Honsell's opinion") that stated, in relevant part,

> Ms. Shera Megan Steere . . . was treated for anxiety and depression on a regular basis from 9/1/2015 until 12/16/2015 at the University of Northern Iowa Counseling Center.
>
> .   .   .

4. Ms. Steere's functioning and judgment were impaired to the point that she could no longer personally and professionally function in an academic setting.

. . .

I have not seen Ms. Steere since 12/16/15, and my last communication with her, other than when I received your records request, was to provide community referrals to her in January of 2016. I am not the appropriate person to do a current evaluation on the client.

(*Id.* at 604.) Ms. Honsell did not provide therapy notes as requested by SSA. However, SSA requested records from UNI Iowa Health Services on April 6, 2018 and UNI complied with the request on April 23, 2018. (*Id.* at 244-90.)

When SSA denied Claimant's initial claim for disability benefits on May 21, 2018, the Personalized Disability Explanation portion of the decision stated, in pertinent part, the following:

We requested evidence regarding your mental health and did receive evidence showing that you were receiving treatment for your conditions; however, there was not enough information received to determine the severity of your conditions as of 3/31/17. Therefore, your request for disability benefits is being denied due to insufficient medical evidence prior to 3/31/2017.

(*Id.* at 62.) State agency reviewing psychologist Vincent Marziano, Ph.D., noted that a letter prepared by Ms. Honsell on May 7, 2018, "gave general opinion regarding observations of claimant's condition, noting she could no longer function in an academic setting. She was seen for three months [from] 09/2015 to 12/2015."[3] (*Id.* at 60.)

In response to the denial of benefits, Claimant wrote a letter to SSA stating that her initial denial was "a miscalculation." (*Id.* at 80.) Claimant stated that she had struggled with depression "for as long as [she] remember[ed]," but that her mental health

---

[3] Claimant mistakenly states that Ms. Honsell provided this opinion at the reconsideration stage. (Doc. 19 at 5.)

8

had deteriorated to the point where she was "significantly disabled" by it in December 2015 and had yet to recover. (*Id.*) She said that she received mental health counseling from September 4 to December 16, 2015 through university counseling services at UNI where she was attending graduate school and applied for accommodations through the school's office of disability services in October 2015. (*Id.*) In spite of these efforts, Claimant did not successfully complete the semester. (*Id.*) Claimant also stated that in March 2017, she sought treatment in the emergency department for suicidal thoughts and that she received ECT[4] treatment from Dr. Darko Zdilar.

On August 8, 2018, on reconsideration, state agency reviewing psychologist Scott Schafer, Ph.D., noted that Claimant included information indicating she received mental health treatment after her LDI of March 31, 2017. (*Id.* at 71, 80.) However, he also concluded there was insufficient evidence in the record prior to March 31, 2017 with which to make a medical determination. (*Id.* at 71, 73.)

At the hearing, Claimant's counsel told the ALJ that the day before the hearing, he discovered that Claimant had ECT treatments in June 2017[5] and requested leave to introduce ECT treatment records into the administrative record. (*Id.* at 5.) The ALJ granted Claimant's counsel leave to produce the ECT records. (AR at 30.) Counsel never produced the records.

### 2. The Parties' Arguments

Claimant argues that the ALJ did not fully and fairly develop the record regarding her impairments. Specifically, Claimant argues that,

> SSA had asked for "information concerning your patient's condition for period 12/2013 – 3/2017" and for addressing Ms. Steere's "remaining work-related abilities despite the limitations of their impairment" and it is

---

[4] "ECT" is an acronym for electroconvulsive therapy.
[5] I believe this reference encompasses the ECT treatments Claimant received in May and June 2017. (AR at 193.)

possible Ms. Honsell thought providing opinions concerning Ms. Steere's mental limitations during the period she provided counseling for Ms. Steere would be responsive to SSA's request. (*See* TR 603).

(Doc. 19 at 5.) Claimant argues that there did not seem to have been an attempt to obtain Ms. Honsell's treatment notes from September 1 to December 16, 2015 when Claimant was seeing Ms. Honsell on a regular basis. (*Id.* at 6 (citing AR 282 and stating that treatment notes of ARNP Nan Ambrosy also support that Claimant was seeing Ms. Honsell in late 2015).)

Claimant notes that both the state agency reviewing psychologists and the ALJ focused on medical records from prior to Claimant's LDI. (*Id.* at 6 (citing AR at 14-16).) Claimant asserts that the only time the ALJ mentioned post-LDI treatment was to state that there was "a significant gap where [Claimant] did not receive treatment between her LDI and 2019." (*Id.*) However, Claimant argues that in her initial SSA intake interview and in the letter she sent to SSA after her initial denial of benefits, she stated that she received ECT treatments from Dr. Zdilar shortly after her LDI. (*Id.* (citing AR at 80, 191, 193, 630).) In addition, in her initial disability report, Claimant reported receiving counseling for depression and anxiety from April to August 2017. (*Id.*) Those records are also not in the record.

Claimant argues that the ALJ could not properly assess her claims without Ms. Honsell's 2015 treatment notes and Dr. Zdilar's 2017 ECT treatment notes. (*Id.* at 6-7 (citing *Snead v. Barnhart*, 360 F.3d 834, 839 (8th Cir. 2004).) Claimant asserts that she was prejudiced by having her case evaluated without these records because the ALJ used the gap in treatment after the LDI against her when Claimant had explained she had received ECT therapy during the time immediately following her LDI. (*Id.* at 7.) Claimant also says she was prejudiced because the ALJ found Ms. Honsell's opinion unpersuasive without having the opportunity to review supporting treatment notes. (*Id.*)

Claimant further asserts that because the ALJ found both medical opinions unpersuasive and because the state agency reviewing physicians did not provide opinions, the ALJ should have "fully developed this record concerning Ms. Honsell [sic] 2015 treatment notes and the Dr. Zdilar post-[LDI] notes, and then request[ ] a medical expert review of the file concerning [her] mental work limitations." (*Id.*)

The Commissioner responds that Claimant has not shown that Ms. Honsell's treatment records even still existed when SSA contacted her, let alone that the records were relevant. (Doc. 20 at 3 (citing *Weber v. Barnhart*, 348 F.3d 723, 725-26 (8th Cir. 2003); *Gross v. Colvin*, 2016 WL 1381797, at *3 (N.D. Iowa, Apr. 6, 2016)).) In addition, the Commissioner argues that Plaintiff also cannot tenably complain that the ALJ noted gaps in her treatment when she abdicated her duty to supply records she alleged were in her possession. (*Id.* at 6 (citing Doc. 19 at 7, 7 n.5).) Lastly, the Commissioner asserts that the ALJ had no obligation to secure another medical opinion because he fully developed every crucial issue in the case and an "ALJ need not tether the work capacity assessment to any medical opinion." (*Id.* at 6 (citing *Hensly v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016).) The Commissioner's other arguments will be addressed in the analysis.

### 3. *Analysis*

A "social security hearing is a non-adversarial proceeding, and the ALJ has a duty to fully develop the record." *Smith v. Barnhart*, 435 F.3d 926, 930 (8th Cir. 2006) (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)). The ALJ bears this responsibility "independent of the claimant's burden to press [her] case" and it extends to cases where claimants are represented by counsel at the administrative hearing. *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004). However, the Eighth Circuit has held:

> Ultimately, the claimant bears the burden of proving disability and providing medical evidence as to the existence and severity of an impairment. *Snead*, 360 F.3d at 836; 20 C.F.R. § 404.1512. Past this

> point, "an ALJ is permitted to issue a decision without obtaining additional
> medical evidence so long as other evidence in the record provides a
> sufficient basis for the ALJ's decision." *Naber v. Shalala,* 22 F.3d 186,
> 189 (8th Cir. 1994).

*Kamann v. Colvin*, 721 F.3d 945, 950 (8th Cir. 2013). The inquiry is whether the claimant "was prejudiced or treated unfairly by how the ALJ did or did not develop the record." *Onstad v. Shalala*, 999 F.2d 1232, 1234 (8th Cir. 1993). Absent unfairness or prejudice, remand is not required. *Id.* (citing *Phelan v. Bowen*, 846 F.2d 478, 481 (8th Cir. 1988)). In addition, the ALJ must determine a claimant's RFC "based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [her] limitations." *Myers v. Colvin*, 721 F.3d 521, 527 (8th Cir. 2013) (alteration in original) (quoting *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000)).

### a.   *ECT Records*

"[E]vidence from outside the insured period can be used in helping to elucidate a medical condition during the time for which benefits might be rewarded." *Moore*, 572 F.3d at 525 (quoting *Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006) (internal quotation marks omitted); *see also Hanovich v. Astrue*, 579 F. Supp. 2d 1172, 1185 n.19 (D. Minn. 2008) ("An ALJ should consider medical records after the date last insured to determine if they reflect a continuation of disability, corroboration of an earlier diagnosis, or are otherwise probative to whether the claimant suffered a disability for any continuous period prior to the expiration of her insured status.") (citation omitted).

Claimant's depression is well-documented in the record. The ALJ detailed the history of Claimant's mental health treatment beginning in March 2016, five months before Claimant's onset of disability date, with citations to treatment notes from six different institutions. (AR at 15-16 (citing treatment notes from The Janesville Clinic (*Id.* at 325, 331); The Waverly Health Center (*Id.* at 461, 464, 467, 479, 482, 488-89,

491, 494, 500); Covenant Clinic Psychiatry (*Id.* at 291-93, 296-97); Covenant Medical Center Emergency Department (*Id.* at 397, 405, 407); the University of Northern Iowa ("UNI") (*Id.* at 282, 285); and Women's Clinic[6] (*Id.* at 552, 557).) The ALJ fairly documented Claimant's mental health treatment over the year from March 2016-March 2017, with a special focus on the final three months of the relevant time period of January to March 2017. (*Id.* at 15-16.)

The ALJ noted that beginning in January 2017, Claimant was disheveled, was upset about a recent breakup with her boyfriend, and felt depressed. (*Id.* at 15 (citing AR at 479).) She was non-compliant with her medications and felt worse because of it. (*Id.*) In February, her medications were adjusted and her emotional distress was exacerbated by family discord. (*Id.* (citing AR at 467).) Despite this, Claimant reported that her mood was better. (*Id.* (citing AR at 467, 557).) Despite feeling "so-so" in early March and having more social contact with friends, including going to the movies, Claimant presented to the emergency department on March 23 for "increased mental health symptoms." (*Id.* at 16 (citing AR at 397).) Claimant reported that her "depression and anxiety [had] been increased for the last few days" and that there had been a lot of stress with graduate school and a relationship. (*Id.*) She was very upset with her boyfriend. (*Id.* (citing AR at 407).) Claimant stated she had suicidal ideations and had never had in-patient mental health treatment. (*Id.* (citing AR at 397).) Claimant stayed overnight in the emergency department and was stable when she was discharged the next day. (*Id.* (citing AR at 405).) On March 30, 2017, one day before her LDI, Claimant saw Dr. Ann Rathe, who noted that although Claimant reported she was doing better and denied feeling hopeless or having any suicidal thoughts (*Id.* (citing AR at 461)), she

---

[6] Although it is unclear, Women's Clinic may be a part of The Waverly Health Center because some treatment notes appear in both sections of the Administrative Record. (*See, e.g.*, AR 641-43, 551-53.)

independently assessed that Claimant was doing poorly and was very depressed (*Id.* (citing AR 553)).[7]

The ALJ stated that although Claimant's symptoms were exacerbated due to situational factors right before her LDI, including relationship issues, prior to March 2017, Claimant had never been hospitalized due to mental health issues and even in 2017, she only spent the night in the emergency room and was never admitted as an inpatient. (*Id.*) The ALJ also noted that after Claimant's LDI there "was a significant gap" where she did not receive mental health treatment until 2019. (*Id.*)

This detailed chronology shows that the ALJ considered the changes in Claimant's mental health toward the end of the relevant time period. Although Claimant argues that she was prejudiced by having her case evaluated without the ECT records, and that the ALJ used the gap in treatment after her LDI against her, a situation that would not have occurred had the ECT records been made part of the administrative record in the case, I find that Claimant misconstrues the ALJ's decision. While the ALJ found the "significant gap" in treatment "notable," the ALJ never relied on "the gap" as a reason to deny Claimant benefits or a reason to assign the RFC that he assigned. In fact, the ALJ never mentioned the lapse in mental health treatment again in the opinion. Even if the ECT treatment notes were made part of the record, a single round of ECT treatments that occurred from May 31 to June 12, 2017 according to Claimant's SSA submission (AR 193-94), would still support the conclusion that but for one two-week round of ECT treatments that occurred shortly after Claimant's LDI, there "was a significant gap" where she did not receive mental health treatment until 2019. (*Id.* at 16.)

_____

[7] The treatment notes appear twice in the administrative record, which accounts for the large page jump between pages from a single office visit.

More importantly, AR 553, the last treatment note cited by the ALJ, states that Dr. Rathe discussed ECT with Claimant and that Claimant was willing to meet with Dr. Zdilar for a consultation. (*Id.* at 553.) Therefore, the ALJ was aware that Dr. Rathe considered ECT an appropriate therapy for Claimant as of her LDI. *See Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010) ("[A]n ALJ's failure to cite specific evidence does not indicate that such evidence was not considered."). Accordingly, I find that Claimant was not prejudiced by the absence of the ECT records from the administrative record. The ECT records would not have been "probative as to whether Claimant suffered a disability for any continuous period *prior* to the expiration of her insured status" because the ALJ sufficiently documented a year of treatment that did not add up to a disability prior to Claimant's LDI. *Hanovich*, 579 F. Supp. 2d at 1185 n.19 (emphasis added). For the same reasons, the ECT records would also not "elucidate a medical condition during the time for which benefits might be rewarded." *Moore*, 572 F.3d at 525. Claimant's depression was sufficiently documented during the relevant time period.

Regarding Claimant's other arguments related to this evidence, she is correct that the state agency reviewing psychologists and the ALJ focused on medical records from prior to her LDI. This is normal in Social Security disability cases. The limited circumstances for which post-LDI evidence is relevant have already been discussed. In addition, while it is true that Claimant noted Dr. Zdilar as one of her healthcare providers in her initial Disability Report (AR at 193), she stated that the dates of treatment were May 31 to June 12, 2017, which is outside of the relevant time period. It appears that other records for treatment received post-LDI were also not made part of the administrative record despite Claimant disclosing the provider information in her initial Disability Report, i.e., April and May 2017 records from Cedar Falls Counseling Associates and May 12, 2017 records from Unity Point Clinic Psychiatry. (*Id.* at 189-

92.)  Claimant makes no allegations that the lack of these records prejudices her in any way.

Remarkably, although Claimant disclosed post-LDI ECT information in her initial disclosures, Claimant mentioned ECT in her letter to SSA after her initial benefits denial, and Claimant's request for benefits had twice been denied for lack of supporting evidence, at the administrative hearing, Claimant's attorney stated that he had just discovered the previous day that Claimant had received ECT treatments.  (AR at 30.)  Despite all the notice in the administrative record, the ALJ gave the attorney leave to produce the ECT records and Counsel agreed to do so.  (*Id.*)  Counsel did not produce the records and now blames the ALJ for failing to obtain records that were clearly outside of the relevant time period.  While the ALJ had a duty to fairly and fully develop the record, Claimant's attorney also had a duty to provide evidence the ALJ tasked him with providing.  *See Banks v. Colvin*, No. 15-CV-01040-CJW, 2017 WL 382239, at *8 (N.D. Iowa Jan. 26, 2017) ("[I]t 'would contravene the principle that the ALJ is not required to act as the claimant's advocate in order to meet his duty to develop the record . . . where, as here, neither counsel nor the claimant have obtained (or, so far as we can tell, tried to obtain) for themselves the records about which they now complain—suggesting that counsel has abandoned his role as advocate in favor of relegating that responsibility to the ALJ.'") (quotation omitted), *aff'd sub nom. Banks v. Berryhill*, 713 F. App'x 528 (8th Cir. 2018).  Here, the ALJ stated, "[I]f you want to round [the ECT record] up and get it in the file on her behalf, by all means, feel free."  (AR at 30.)  Apparently, Claimant's attorney did not feel it necessary to "get it in the file" prior to the ALJ's decision, and cannot now argue that Claimant was prejudiced by that decision.[8]

---

[8] Claimant takes issue with the Commissioner's argument that "Plaintiff also cannot tenably complain that the ALJ noted gaps in her treatment when she abdicated her duty to supply records she alleged were in her possession."  (Doc. 20 at 6.)  Claimant argues, "The Commissioner

### b. *Ms. Honsell's Treatment Notes*

Likewise, Claimant was not prejudiced because the administrative record did not contain Ms. Honsell's treatment notes. Contrary to Claimant's argument that "there did not seem to have been an attempt to obtain Ms. Honsell's treatment notes from September 1 to December 16, 2015 when Claimant was seeing Ms. Honsell on a regular basis" (Doc. 19 at 6), SSA requested medical records from UNI Health on April 6, 2018 covering the period from December 2013 to March 2017. (AR at 244.) On the bottom of the cover sheet where SSA explains the types of documentation it requested from UNI, which included mental health records, someone wrote the following note:

> Shera Steere was seen at the University of Northern Iowa Student Health Clinic while she was a student at UNI. She has not been seen since 12/2/15, therefore we are unable to determine her current physical condition. The mental health care provider she saw is no longer practicing at the University of Northern Iowa.

(*Id.* at 246.) UNI sent 43 pages of medical records to SSA on or about April 23, 2018, some of which are relevant to Claimant's mental health during the period of time when

seems to have asserted the Dr. Zdilar records were in Ms. Steere's possession. . . . This is an odd statement." (Doc. 21 at 4.) As discussed above, the ALJ clearly gave Claimant the opportunity to "round up" the ECT records. (AR at 30.) The arguments in the Commissioner's brief recognize that neither SSA nor Claimant made Dr. Zdilar's ECT treatment notes part of the record. I can only speculate that the Commissioner's brief contains a typographical error or an oversimplification referring to the burden the ALJ clearly placed on Claimant, whether Claimant actually had copies of her medical records at that time or not. Resolution of this semantic issue is not necessary. The treatment notes were outside of the relevant time period and therefore it appears SSA did not automatically request them from Dr. Zdilar. There was ample notice in the administrative record that these treatment notes existed before Claimant was assigned counsel on October 3, 2018. (AR at 89.) Counsel did not ask SSA to obtain the treatment notes and did not do so himself, instead claiming exactly one year after he was appointed to have just learned about the treatment notes during a conversation with Claimant the previous day. (*Id.* at 30.) The ALJ therefore gave Counsel the responsibility to supplement the administrative record with these treatment notes. (*Id.*) Counsel accepted the responsibility. (*Id.*) Counsel did not so supplement the administrative record.

Claimant was seeing Ms. Honsell for counseling. (*Id.* at 278-89.) The medical records include records from several different healthcare professionals, which indicates that if Ms. Honsell's records were available, UNI would have provided those records to SSA. Therefore, I agree with the Commissioner that Claimant has not even shown that Ms. Honsell's treatment notes still existed when SSA was contacted. (Doc. 20 at 3.) UNI's timely and expansive response therefore moots Claimant's argument that SSA had a duty to make a follow-up request. (Doc. 21 at 2 (citing SSR 17-4p).) At the hearing, Claimant did not say these records were missing when the ALJ asked, "Anything you're aware of relating to whether the claimant is or is not disabled that hasn't already been exhibited in the case?" (AR at 30.) Claimant's attorney only said the ECT records were missing. (*Id.* at 31.) More importantly, Claimant could have tried to obtain these records after she was first denied benefits because the reviewing psychologist found insufficient evidence in the record from which to make a decision or when she appealed the ALJ's decision to the Appeals Council. Claimant failed to do so. *See Gross v. Colvin*, No. 15 CV 1030 EJM, 2016 WL 1381797, at *3 (N.D. Iowa Apr. 6, 2016) (finding ALJ fulfilled his investigative duty when there was no indication additional records existed and claimant "did not even secure additional records to present to the Appeals Council") (citing *Weber v. Barnhart*, 348 F.3d 723, 726 (8th Cir. 2003)). Importantly, SSA offered to help Claimant obtain evidence she felt was important to the disposition of her case. (AR at 93.) In a letter dated almost a year prior to the hearing, SSA told Claimant SSA would help her secure evidence, including subpoenaing documents. (*Id.*) Claimant's attorney received a copy of this letter. (*Id.* at 94.) Claimant did not take advantage of this offer.

The Commissioner also points out that Claimant did not inform the ALJ about outstanding evidence five or more business days before the hearing as instructed by the ALJ in a notice sent to both Claimant and her attorney on July 9, 2019, almost two

months before the hearing. (*Id.* at 109.) This notice explained that if Claimant failed to comply with the requirement, the ALJ might decline to consider the evidence. (*Id.*) Claimant neither submitted evidence nor gave notice of any outstanding evidence from Ms. Honsell. (*Id.*)

To the extent Claimant argues she was prejudiced because the ALJ could not properly assess her claims without Ms. Honsell's treatment notes or because the ALJ found Ms. Honsell's opinion unpersuasive without supporting treatment notes, those arguments are without merit for the reasons just discussed. Moreover, as will be discussed below, the ALJ noted that Ms. Honsell only treated Claimant from September to December 2015 and that her opinion was not supported by the longitudinal evidence in the record as a whole. (*Id.* at 17.) Even if Ms. Honsell's opinion had been supported by her own treatment notes, the facts that the treatment occurred 8-13 months before Claimant's onset of disability date,[9] was for such a short period of time, and was when Claimant was under situational academic pressure, all tend to detract from the persuasiveness of the opinion. (*Id.* at 604.)

Claimant's Exhibit 1 is an October 7, 2021 letter from Ms. Honsell confirming that Claimant attended regular counseling sessions at the UNI Counseling Center from September to December 2015. (Doc. 21-1 at 1.) Ms. Honsell states that Claimant's symptoms—memory and concentration difficulties, low self-worth, lack of motivation, and sleep problems—interfered with her school work, ultimately resulting in Claimant giving up her graduate assistantship and choosing to not re-enroll in classes in spring 2016. (*Id.*) Ms. Honsell attached a September 1, 2015 initial assessment conducted by David Towle, Ph.D. (*Id.* at 2.) Dr. Towle listed Claimant's counseling goals as

---

[9] September to December 2015 is not even within the twelve-month period of March 2016 to March 2017 the ALJ evaluated to attempt to establish one year of disability for Claimant, which already includes five months of time prior to Claimant's onset of disability date.

improving her confidence, reducing anxiety, having the opportunity to talk about family concerns, and receiving feedback. (*Id.*) Claimant states that these records are all that she has received so far, but "shows that additional records Ms. Honsell likely relied on and reviewed while providing her opinions likely exist, but they are still difficult to obtain." (*Id.*) I respectfully disagree.

This exhibit was received four-and-one-half years after SSA sent its document request to UNI. The exhibit was sent directly to Claimant's attorney. (*Id.* at 1.) In her cover letter, Ms. Honsell does not state that more records were requested or that more records were coming. She states that her letter and Dr. Towle's intake form were provided "in response to the request made by you and your client, Ms. Shera Steere." (*Id.*) If Claimant had requested treatment notes, it is logical that this cover letter would have mentioned that request or at least stated that the notes would follow under separate cover. Instead, the letter merely states, "If I can be of further assistance, please feel free to contact me. . . ." (*Id.*) This indicates that Ms. Honsell provided all information requested by Claimant. (*Id.*) Again, the Court is left to speculate as to whether treatment notes that are almost seven-years-old still exist, especially when UNI already provided responsive documents from multiple healthcare providers in response to SSA and then provided Exhibit 1 in response to Claimant's request. [10] Therefore, I find that Claimant's arguments are speculative, at best. These treatment notes have been the subject of a document request that was fulfilled by UNI. In addition, Ms. Honsell was asked to

---

[10] The parties discussed statements the ALJ made at the hearing regarding Claimant's attorney's firm's practice of writing letters to SSA stating the record will be updated in time to meet the ALJ's deadline to have a complete record five days prior to the hearing and then writing "5-day letters" saying exhibits are not yet in the record. (AR at 32-33.) The ALJ suggested that time could be better spent getting all records in earlier, giving ALJs time to read complete records prior to hearings. (*Id.* at 33.) The parties' statements are not relevant to the issues before the Court and are not addressed in this Report and Recommendation. (Docs. 20 at 5; 21 at 2-3.)

provide supporting treatment notes with her opinion and failed to do so.  (AR at 606.)
Then, Claimant obtained Exhibit 1, which indicates that no other treatment notes exist.
Three bites at the proverbial apple is more than enough for treatment notes that do not
even address Claimant's mental health during the relevant time period.  Claimant is not
prejudiced because these treatment notes are not part of the administrative record.

### c.      *Expert Review of the File*

Finally, I find that the ALJ did not err by declining to update the record with Ms.
Honsell's 2015 treatment notes and Dr. Zdilar's post-LDI ECT treatment notes and then
ordering medical expert review of the file.  "The ALJ's obligation to develop the record
'is triggered only when there is ambiguous evidence or when the record is inadequate to
allow for proper evaluation of the evidence.'"  *Coleman v. Colvin*, No. 13cv1004 EJM,
2013 WL 4069523, at *2 (N.D. Iowa Aug. 12, 2013) (quoting *Mayes v. Massanari*, 276
F.3d 453, 459-60 (9th Cir. 2001)).  "Because a claimant's RFC is a medical question,
an ALJ's assessment of it must be supported by some medical evidence of the claimant's
ability to function in the workplace."  *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir.
2016) (citation omitted).  "However, there is no requirement that an RFC finding be
supported by a specific medical opinion."  *Id.* (citing *Myers*, 721 F.3d at 526-27)
(affirming RFC without medical opinion evidence); *Perks v. Astrue*, 687 F.3d 1086,
1092-93 (8th Cir. 2012) (same)).  "In the absence of medical opinion evidence, 'medical
records prepared by the most relevant treating physicians [can] provide affirmative
medical evidence supporting the ALJ's residual functional capacity findings.'"  *Id.*
(alteration in original) (quoting *Johnson v. Astrue*, 628 F.3d 991, 995 (8th Cir. 2011)).

Claimant was not treated unfairly or prejudiced by the ALJ's decision.  The
evidence in the record is not ambiguous or inadequate to allow the ALJ to properly
evaluate the evidence.  *See Coleman*, 2013 WL 4069523, at *2.  Based on the record
before the ALJ,  he was "permitted to issue a decision without obtaining additional

medical evidence" because "other evidence in the record provide[d] a sufficient basis for the ALJ's decision." *Kamann*, 721 F.3d at 950 (quotation omitted). Here, the ALJ cited treatment notes to support his decision. (AR at 14-18.) In this way, the instant case can be distinguished from *Lauer v. Apfel*, in which the Eighth Circuit found it was "unclear as to the medical basis, if any, for [the ALJ's] assessment of the degree to which Mr. Lauer's mental impairments affected his RFC." 245 F.3d 700, 705 (8th Cir. 2001). *Hutsell v. Massanari* can also be distinguished from the instant case because, as will be discussed below, treatment notes support the ALJ's decision. 259 F.3d 707, 712 (8th Cir. 2001) (remand required when medical opinions inconclusive and no medical opinion supported ALJ's decision).

Claimant cites *Nevland v. Apfel,* 204 F.3d 853, 857 (8th Cir. 2000) for the proposition that a claimant's RFC must ordinarily be supported by a professional opinion to be supported by substantial evidence. (Doc. 19 at 3.) *Nevland* is still good law and on first blush it appears to be at odds with *Hensley*, 829 F.3d at 932. However, the two cases can be harmonized. The question in a situation like the one at bar where the ALJ found the opinion evidence generally unpersuasive and relied instead on treatment notes to support his decision, becomes whether the "other medical evidence of record . . . might fill the gap by clearly establishing a claimant's RFC to do other work, and to function in the workplace." *Barrows v. Colvin*, No. C 13-4087-MWB, 2015 WL 1510159, at *3 (N.D. Iowa Mar. 31, 2015) (quoting then-Magistrate Judge Strand, who was citing *Hattig v. Colvin*, No. C. 12–4092, 2013 WL 6511866, *11 (N.D. Iowa Dec. 12, 2013)). As discussed above, the evidence supports the ALJ's decision regarding updating the record and no further development of the record is required. *See Hacker*, 459 F.3d at 936 (ALJ's decision is not outside the acceptable zone of choice because the court might have reached a different decision on the same evidence). Moreover, as discussed below, substantial evidence on the record as a whole supports the ALJ's

decision that Claimant was not disabled. Therefore, the ALJ's obligation to further develop the record on this issue was not triggered because the evidence is not ambiguous or inadequate. Claimant not only failed to establish that she had a mental impairment that prevents her from performing the jobs cited by the ALJ, she also failed to establish there was an ambiguity on the issue. *See Coleman*, 2013 WL 4069523, at *2.

> ### d. Conclusion

I recommend the District Court affirm the ALJ's decision on this issue.

## B. Whether the ALJ Provided Sufficient Reasons for Finding Ms. Honsell's Opinion Unpersuasive

Ms. Honsell's May 7, 2018 report consisted of a letter ("Ms. Honsell's opinion") that stated the following:

> Ms. Shera Megan Steere . . . was treated for anxiety and depression on a regular basis from 9/1/2015 until 12/16/2015 at the University of Northern Iowa Counseling Center.
>
> .   .   .
>
> 1. Ms. Steere's memory was significantly impacted by her symptoms, and she often had difficulty understanding and completing assignments in the time allotted.
> 2. Ms. Steere's major depression and anxiety significantly impaired her concentration, and ability to maintain attention.
> 3. The client reported interpersonal difficulties with professors and supervisors during the time she was being treated at the UNI Counseling Center.
> 4. Ms. Steere's functioning and judgment were impaired to the point that she could no longer personally and professionally function in an academic setting.
>
> .   .   .
>
> I have not seen Ms. Steere since 12/16/15, and my last communication with her, other than when I received your records request, was to provide community referrals to her in January of 2016. I am not the appropriate person to do a current evaluation on the client.

(*Id.* at 604.)

The ALJ analyzed the opinion in the following way:

> In May 2018, Gretchen Honsell, MA, LMHC, NCC, wrote a brief statement on the claimant's behalf (8F). Ms. Honsell opined that the claimant's functioning and judgment were impaired to the point that she could no longer personally and professionally function in an academic setting. Ms. Honsell had seen the claimant from 09/01/2015-12/16/2015. The undersigned finds this opinion to be unpersuasive because it is inconsistent with and not supported by the longitudinal evidence of record. It is inconsistent with the record because the record shows that the claimant was able to engage in school after December 2015. It is not supported by the record because Ms. Honsell does not even support her own opinion but rather stated "I am not the appropriate person to do a current evaluation on the client" (8F p.3). The claimant had a brief treating relationship with Ms. Honsell.

(*Id.* at 17.)

### 1. Relevant Law

Claimant's claim was filed after March 27, 2017. Therefore, the rules articulated in 20 C.F.R. Sections 404.1520c apply to analysis of this opinion. Under these rules, no medical opinion is automatically given controlling weight. 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Opinions from medical sources are evaluated using the following factors: (1) supportability, (2) consistency, (3) provider's relationship with the claimant, (4) specialization, and (5) other factors. *Id.* §§ 404.1520c(c), 416.920c(c). Supportability and consistency are the most important factors when determining "how persuasive the ALJ find[s] a medical source's medical opinions . . . to be." *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2). The ALJ "may, but [is] not required to, explain how [he or she] considered the factors in paragraphs (c)(3) through (c)(5). . . ." *Id.*

### 2. The Parties' Arguments

Claimant takes issue with the ALJ's reliance on her ability to attend school after December 2015. Claimant argues that her "graduate school experience after December of 2015 was not engaging in classes successfully, it was attempting and failing, with

24

accommodations, to maintain a light course load." (Doc. 19 at 10 (citing AR at 39-42, 80).) Claimant cites multiple treatment notes documenting the difficulty she had with school in 2016 and 2017. (*Id.* at 10-11.) Claimant also argues that although the ALJ found Ms. Honsell's opinions unpersuasive in part because they were not current, the opinions predicted Claimant's personal and academic problems leading up to the relevant time period. (*Id.* at 11 (citing AR at 80).) In addition, Claimant takes issue with the ALJ's note that Ms. Honsell had a brief treatment history with Claimant and asserts that "without having Ms. Honsell's treatment notes in the record, the ALJ could not weigh her treatment history against her opinions." (*Id.* at 11-12.)

The Commissioner responds that Ms. Honsell specifically limited her opinions to the time she treated Claimant and there is no support for Claimant's assertion that she "predicted Claimant's claimed but unproven personal and academic difficulties during the relevant period." (Doc. 20 at 7.) The Commissioner argues that prior to analyzing Ms. Honsell's opinions, the ALJ reviewed Claimant's mental health records from 2016 and 2017, "noting clinical findings and plaintiff's statements showing much better functioning." (*Id.* at 7-8.) Thus, the Commissioner argues that the ALJ fulfilled his obligation to assess Ms. Honsell's opinion in the context of Claimant's entire medical record and there was no obligation to re-discuss all the evidence he had already discussed. (*Id.* at 8 (citing *Phillips v. Saul*, 2020 WL 3451519, at *3 (E.D. Ark. June 24, 2020)).)

The Commissioner states that while the ALJ was aware that Claimant struggled, Claimant demonstrated better abilities than Ms. Honsell suggested, which undermined Ms. Honsell's opinion. (*Id.* at 8-9 (citations omitted).) The ALJ also argues that Ms. Honsell's opinion does not even address the relevant time period. Finally, the ALJ asserts that Claimant's mental health improved when she was compliant with her medications. (*Id.* at 10.)

### 3.    Analysis

Supportability and consistency are the most important factors when determining "how persuasive the ALJ find[s] a medical source's medical opinions . . . to be." 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).  The ALJ "may, but [is] not required to, explain how [he or she] considered the factors in paragraphs (c)(3) through (c)(5). . . ." *Id.*

#### a.    Supportability

"The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . ., the more persuasive the medical opinions . . . will be." 20 C.F.R. §§ 404.1520c(c)(1); 416.920c(c)(1).

Ms. Honsell treated Claimant "on a regular basis" for anxiety and depression from September 1 to December 16, 2015.  (AR at 604.)  Although she was instructed to include therapy notes to support her statement, she did not do so.  (*Id.* at 603.)  Therefore, Ms. Honsell provided little support for her opinions other than to restate things Claimant had told her about difficulties completing assignments and maintaining relationships with professors and supervisors.  This factor weighs in favor of finding the opinion unpersuasive.

#### b.    Consistency

"The more consistent a medical opinion[] . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion[] . . . will be." 20 C.F.R. § 404.1520c(c)(2); 20 C.F.R. § 416.920c(c)(2).

#### i.    The Parties' Arguments

Claimant argues that the following treatment notes and testimony supports Ms. Honsell's opinions.  Claimant testified that after 2015, she received accommodations at school and reduced her teaching assistant responsibilities, but that she was still depressed.

(AR at 39-42.) She failed one class and withdrew from another class in fall 2015. (*Id.* at 80.) Claimant took spring semester off and returned to school in fall 2016, taking half a course load. (*Id.* at 80, 296, 304, 485 (Claimant taking 5 credits "to ease back in plus try to complete incomplete course work").) Claimant notes that although she was able to pay attention in her fall 2016 classes, she struggled to write the papers for her incomplete class. (*Id.* at 482.) Claimant finished her classes that semester, but worried how she would function in her classes beginning in January 2017. (*Id.* at 479.) During the spring semester, Claimant fell behind and presented at the emergency department for a psychiatric evaluation because she had suicidal ideations. (*Id.* at 80, 467, 464, 397.) Although she completed the spring 2017 semester in good standing, it is unclear if she had to carry any incompletes forward to do so; Claimant missed at least two days of classes and was behind on coursework in late March. (*Id.* at 42, 80, 461.) Claimant argues that her schooling "was not a success and was entirely consistent with Ms. Honsell's opinions that [she] would not be able to 'professionally function in an academic setting' . . . [She] was not able to function in her academic setting after taking a break, carrying incompletes, and despite accommodations eventually gave up in March of 2017." (Doc. 19 at 11.)

Claimant also argues that during this time period, she had difficulties getting motivated to complete her schoolwork. (*Id.* at 10.) Claimant notes that by June 6, 2016, she was contemplating completing schoolwork to take a class that started on June 20, "but had trouble finding the motivation to start." (*Id.* (citing AR at 296).) Claimant did not complete the work and did not take the summer course. (*Id.* (citing AR at 293, 291, 488).) Claimant was still not motivated to finish the coursework in July 2016. (*Id.* (citing AR at 488 (Claimant reported she was not motivated to complete coursework because she did not know what to do with her master's degree and was scared she would not be able to complete the work).)

27

Claimant therefore argues that Ms. Honsell's opinions predicted Claimant's personal and academic problems leading up to the relevant time period. (*Id.* at 11 (citing AR at 80).) In addition, Claimant takes issue with the ALJ's note that Ms. Honsell had a brief treatment history with Claimant, and asserts that "without having Ms. Honsell's treatment notes in the record, the ALJ could not weigh her treatment history against her opinions." (*Id.* at 11-12.) Thus, Claimant argues that the "ALJ did not articulate sufficient reasons for finding Ms. Honsell's treating therapist opinions unpersuasive, harm is apparent, and this Court should reverse the ALJ's decision and remand [her] claim. (*Id.* at 12 (citing, *inter alia*, *Phillips*, 2020 WL 3451519).)

Most of the Commissioner's arguments will be incorporated into the following analysis. As an overview, the Commissioner first notes that Ms. Honsell limited her opinion not only to a time that was well before the relevant time period in this case, but also to the academic setting. (Doc. 20 at 7-8.) The Commissioner also asserts that although the ALJ was aware that Claimant struggled, Claimant demonstrated better abilities than Ms. Honsell suggested, which undermined Ms. Honsell's opinion. Specifically, the Commissioner argues that although Claimant had some difficulties, she could function once she returned to classes. (*Id.* (citing AR 467; 476; 482).)

The Commissioner also argues that the ALJ noted that Claimant's mental health improved when she was compliant with her medications. (*Id.* at 9-10 (citing AR at 15, 291, 327-28, 483-84).) Like Claimant, the Commissioner relies on Claimant's lack of motivation as the basis for certain arguments, but asserts that Claimant cannot interpret this lack of motivation as a disabling impairment.

> Furthermore, plaintiff's dislike of writing and concern about the practical application of her degree, rather than her mental diagnoses, played a role in her performance. In July 2016, plaintiff told Christine Ewald, L.M.H.C., that she was not motivated to work on her master's degree because she did not know what to do with the completed degree (Tr. 15, 488). While the ALJ did not specifically discuss Plaintiff's motivation to

28

finish her master's degree, plaintiff is not qualified to interpret the record and link her lack of motivation to a disabling mental impairment. *See* Pl. Br. at 17. In October 2016, plaintiff said she struggled when writing papers for her incomplete class because she had no interest in the topics and did not like writing (Tr. 15, 482). Not enjoying writing or the academic subject do not translate to mental impairments. During these same months, Ann Rathe, M.D., wrote, "I do not get the sense that she is 'stuck' because of depressive symptoms but will monitor that" (Tr. 15, 489). Dr. Rathe rated plaintiff's depression as significantly better and plaintiff denied unmanageable worry or social anxiety (Tr. 488). Ms. Ewalld noted plaintiff's symptoms improved with medication compliance (Tr. 15, 291). Plaintiff had some worry about the future, no concentration problems, normal thought processes and cognition, and fair insight and judgment (Tr. 291-92). These observations suggested better functioning than plaintiff or Ms. Honsell alleged.

(*Id.* at 9.)

The Commissioner also argues that the administrative record supports functioning consistent with the ALJ's RFC, "which still allowed for significant social restrictions."[11] While plaintiff and Ms. Honsell "suggested interpersonal difficulties with professors and supervisors in 2015," the Commissioner notes that Claimant was able to plan her niece's shower; socialize; spend time with her niece and with friends; complete basic chores without difficulty; and have a boyfriend, although that relationship was "stormy due to his commitment issues." (*Id.* (citing AR at 296; 488; 491; 293; 479; 291.)

### ii. Analysis

It is important to recognize that Ms. Honsell's opinions do not relate to the relevant time period. Her letter was written on May 7, 2018 and all opinions are written in the past tense. (AR at 80.) In addition, in spite of being asked to opine as to Claimant's

---

[11] Claimant's RFC limits her to occasional interaction with the public, coworkers, and supervisors. "Occasionally means occurring from very little up to one-third of the time." SSR 83-10, 1983 WL 3125, at *6.

"remaining work related abilities" (*Id.* at 603), Ms. Honsell specifically stated that at the time she was treating Claimant in 2015, Claimant's "functioning and judgment were impaired to the point that she could no longer personally and professionally function in an academic setting." (*Id.* at 604.) The ALJ recognized that Ms. Honsell limited her opinions to the academic setting because he found them unpersuasive, in part, because Claimant was able to engage in school after December 2015. (*Id.* at 17.) I find that the ALJ's decision is supported by substantial evidence.

Claimant cites several pages of the administrative record in support of her argument that after 2015, her mental health deteriorated to the point that she could not successfully complete graduate school, even after receiving accommodations, reducing her teaching assistant responsibilities, and taking the spring 2016 semester off. Although Claimant notes that she failed one class and withdrew from another class in fall 2015, took spring semester 2016 off, and returned in to school in fall 2016 with a half course load, the ALJ correctly began his analysis in March 2016, one year before Claimant's LDI. *Medhaug v. Astrue*, 578 F.3d 805, 813 (8th Cir. 2009) ("To receive disability benefits, [Medhaug] must establish a physical impairment lasting at least one year that prevents [him] from engaging in any gainful activity.") (alterations in original) (quoting *Kelley v. Callahan,* 133 F.3d 583, 587 (8th Cir. 1998)).

The ALJ noted that throughout spring 2016, Claimant was "doing well and [was] happy," "less depressed," "able to socialize with others and plan[] events," and "had been feeling better and had more energy." (AR at 14-15.) Even in June, when Claimant stated that she was experiencing symptoms of depression and increased crying, lack of energy, and problems sleeping, the ALJ opined that these could have been caused by situational stressors related to a breakup with her boyfriend. (*Id.* at 15.) Claimant does not take issue with this finding. Situational stressors cannot provide the basis of a

disability finding.[12]  *See Gates v. Astrue*, 627 F.3d 1080, 1082 (8th Cir. 2010); *Dunahoo v. Apfel*, 241 F.3d 1033, 1040 (8th Cir. 2001).  By July, Claimant's symptoms had improved, she was feeling better emotionally, was beginning to feel bored, and was able to engage in interpersonal relationships.  (AR at 15.)

Claimant argues that during this time period, she had difficulties with motivation to complete her schoolwork and missed the opportunity to take a summer class because she did not complete the coursework necessary to register for the course, which is evidence that she did not successfully engage in school after December 2015.  (Doc. 19 at 10.)  The Commissioner responds that Claimant's dislike of writing and concern about the practical application of her degree, rather than her diagnosis, affected her motivation. (Doc. 20 at 9.)  The Commissioner acknowledges that the ALJ did not discuss Claimant's motivation to finish her degree, but argues that Claimant is not qualified to link Claimant's lack of motivation to finish her master's degree to a disabling impairment. (*Id.*)  Claimant replies,

> The Commissioner engages in *Chenery* doctrine violations responding to this argument. The Commissioner recognizes that the ALJ did not rely on what the Commissioner characterizes as a lack of "motivation to finish her master's degree" but still argues that allows for the ALJ to have discounted Ms. Honsell's opinions. (Def. Br. at 9, ECF No. 20). Under the articulation standard under the new opinion regulations, it is especially important that the Commissioner stop with these post hoc rationalizations, as the Eighth Circuit recently explained. *Bonnett v. Kijakazi*, 2021 WL 4258770, 859 Fed. Appx. 19 (8th Cir. Sept. 20, 2021) (unpublished, explaining, "While the Commissioner argues that Dr. Thompson's opinion was not consistent with specific other evidence in the record, we will not affirm on this basis, as the ALJ made no such findings. *See SEC v. Chenery Corp.*, 318 U.S.

---

[12] At other times, the ALJ found that Claimant experienced stress due to her relationship with her boyfriend and "family discord."  (AR at 15-16.)

80, 87 (1943) (reviewing court may not uphold agency decision based on reasons not articulated by agency itself in its decision).").[13]

(Doc. 21 at 5.)

First, I find it somewhat disingenuous for Claimant to accuse the Commissioner of raising a *Chenery* issue based on a response to an argument Claimant first presented to the Court.  Second, I find that the Commissioner is not suggesting that this Court affirm the ALJ's decision based on Claimant's lack of motivation to complete her master's degree when the ALJ did not do so. The Commissioner first responds to Claimant's argument that Claimant was unable to complete her incomplete course work or take a summer 2016 class because her mental health issues prevented her from doing so by pointing to evidence that Claimant had no interest in the subject matter and did not like writing.  (Doc. 20 at 9.)  The Commissioner cited Dr. Rathe's treatment notes (AR 482, 488), one of which—(AR 488)—was also cited by Claimant to support the argument that Claimant reported she was not motivated to complete coursework because she did not know what to do with her master's degree and was scared she would not be able to complete the work.  The treatment note also states that Claimant was "feeling pretty good but [was] bored," that she denied having social anxiety or unmanageable worry, and that she was working out regularly.  (*Id.*)  Three months later, in October 2016, Claimant was able to pay attention in her two graduate classes but struggled to write the papers for

---

[13] In *Securities & Exchange Comm'n v. Chenery Corp.*, 332 U.S. 194, 196 (1947), the Court held that when reviewing a commissioner's decision, the court "must judge the propriety of such action solely by the grounds invoked by the agency" and may not affirm the decision based on a post hoc rationale that "it considers to be a more adequate or proper basis." *See also Banks v. Massanari*, 258 F.3d 820, 824 (8th Cir. 2001) ("'[A] reviewing court may not uphold an agency decision based on reasons not articulated by the agency,' when 'the agency [has] fail[ed] to make a necessary determination of fact or policy' upon which the court's alternative basis is premised.'") (quoting *Healtheast Bethesda Lutheran Hosp. and Rehab. Ctr. v. Shalala,* 164 F.3d 415, 418 (8th Cir. 1998)) (alterations in original).

her incomplete classes, which "she attribut[ed] . . . to lack of interest in the topics." She deni[ed] poor focus during non-academic tasks and her memory [was] good." (*Id.* at 482.)

The Commissioner is correct that "[n]ot enjoying writing or the academic subject do not translate to mental impairments." Pointing out that Claimant does not enjoy writing also does not mean that the Commissioner was encouraging the Court to adopt Claimant's lack of motivation as an alternate reason to affirm the ALJ's decision. Rather, in context, this lack of motivation was merely evidence in the treatment notes that supported the ALJ's decision that Claimant had the mental health to be successful in an academic setting after December 2015. (AR at 17.) The Commissioner pointed to other evidence that also showed that Claimant had the mental health to be successful academically in the summer of 2016: Although Claimant expressed some worry about the future to Licensed Mental Health Counselor Christine M. Ewald in July 2016, she had no concentration problems, normal thought processes and cognition, fair insight and judgment, and was feeling better and starting to feel bored. (*Id.* at 291-92.) That same month, Dr. Rathe noted that Claimant was "doing significantly better" and opined that while Claimant lacked vocational direction and had "stalled academically, . . . [she did] not get the sense that [Claimant was] 'stuck' because of depressive symptoms but [would] monitor that." (*Id.* at 489.) Therefore, I find the Commissioner did not commit a *Chenery* violation. *Cf. Bonnett v. Kijakazi*, 2021 WL 4258770, 859 Fed. Appx. *20 (8th Cir. Sept. 20, 2021) (remanding case because the district court affirmed the ALJ's decision on supportability of physician's opinion based on a finding the ALJ never made).

Although Claimant states that she struggled to write the papers to complete her incomplete classes during the fall 2016 semester, she admits she was able to pay attention in her fall classes. In September, Claimant had already done most of the assignments for her online class. (AR at 485.) In October, Dr. Rathe stated that Claimant's depression

was in remission. (*Id.* at 483-84.) Claimant finished her fall classes, but worried how she would function in spring 2017 classes. (*Id.* at 479.) However, at the appointment where Claimant told Dr. Rathe she was worried about functioning spring semester, she had abruptly stopped taking one of her depression medications after experimenting with the dosage. (*Id.*) Claimant was also very depressed after a bad argument with her boyfriend who would not fully commit to their relationship. (*Id.*)

In January 2017, Claimant reported to Dr. Rathe that she attended classes in spite of feeling anxious and did "ok." (*Id.* at 476.) In February 2017, Claimant returned to Dr. Rathe who had adjusted her medications twice in the previous month and reported she was more able to engage in class, absorb information, and concentrate, which was "definitely a change for the better." (*Id.* at 467.) Dr. Rathe described Claimant's mood as depressed, but more hopeful. (*Id.*) Although Claimant presented to the emergency department in March for a psychiatric evaluation, the ALJ noted that she was never admitted and was stable when she was discharged the next day. (*Id.* at 17 (citing AR at 405).) Claimant explained to doctors that she had a lot of stress with graduate school and a relationship. (*Id.* (citing AR at 397).) Claimant went back to school after this incident and completed the spring 2017 semester in good standing, although it is unclear if she had to carry any incompletes forward to do so.

To the extent Ms. Honsell's assessment that Claimant could not function in an academic setting is even relevant, this evidence supports the ALJ's conclusion that Claimant was able to engage in school after December 2015. *See Hacker*, 459 F.3d at 936 (decision is not outside acceptable zone of choice simply because the court might have reached a different decision). The evidence also undermines Claimant's argument that Ms. Honsell predicted Claimant's future academic struggles. While Claimant had some difficulties returning to graduate school, she was able to successfully complete both fall 2016 and spring 2017 semester classes. That Claimant does not like writing and

perhaps chose a field of study that required more writing than she anticipated does not change the conclusion that Claimant's academic performance did not undermine her RFC.

Claimant's RFC limits Claimant to "no more than occasional interaction with the general public, co-workers, and supervisors [and] work itself [that] deals with things, rather than people." (AR at 13.) Substantial evidence in the record supports this RFC and belies Ms. Honsell's opinion that in 2015 Claimant "reported interpersonal difficulties with professors and supervisors." (*Id.* at 604.) As the ALJ noted, Claimant engaged in a wide variety of activities with different people. She planned her niece's shower; socialized; spent time with her niece and with friends; saw a movie with friends, and had a boyfriend, although the ALJ noted that the couple broke up at least once during the relevant time period and that she was angry with him. (*Id.* at 15-16.)

The ALJ also noted that when Claimant was compliant with her medications her symptoms improved and when Claimant was non-compliant she was more depressed. (*Id.* at 15 (citing AR at 467, 479).) Dr. Rathe noted that although Claimant appeared disheveled when she was non-compliant, she still maintained fair judgment and insight and good recent and remote memory. (*Id.* at 480.)

Lastly, Claimant takes issue that "the ALJ noted Ms. Honsell had a brief treating relationship with Ms. Steere. (TR 17). However, without fully developing the record as to Ms. Honsell's treatment notes, the ALJ could not weigh her treatment history against her opinions." (Doc. 19 at 11-12.) The Commissioner is correct that the ALJ did not need treatment notes to understand the *length* of Ms. Honsell's treating relationship with Claimant as opposed to the *frequency* of her examinations. *Compare* 20 C.F.R. § 404.1520c(c)(3)(i) ("Length of the treatment relationship. The length of time a medical source has treated you may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s).") *with* 20 C.F.R. § 404.1520c(c)(3)(ii) ("Frequency of examinations. The frequency of your visits with the medical source may

help demonstrate whether the medical source has a longitudinal understanding of your impairment(s).").  This argument is without merit.

### iii.  Conclusion

For all the reasons stated above, I conclude that this factor weighs in favor of finding the opinion unpersuasive.

### c.  Conclusion

I recommend the District Court affirm this part of the ALJ's decision.

## C.  Whether the ALJ Provided Sufficient Reasons for Finding Dr. Ann Rathe's Opinion Unpersuasive

Dr. Rathe completed a mental impairment check-box, fill-in-the-blank questionnaire on September 3, 2019.  (AR at 606-11.)  Dr. Rathe stated that Claimant has seen either her or Ms. Stacia Danielson approximately every two weeks since April 2016.  (*Id.* at 606.)  As the ALJ noted, Dr. Rathe stated that Claimant had been "chronically disabled by anxiety and depression . . . since [they met] in 2016." (*Id.* at 17, 606.)  Dr. Rathe indicated that Claimant would be "seriously limited" in her abilities to perform four of 16 mental abilities and aptitudes needed to perform unskilled work. (*Id.* at 607-08.)  She stated that Claimant had no useful ability to function or would be unable to meet competitive standards related to eight other abilities and aptitudes needed to perform unskilled work.  (*Id.*)  Dr. Rathe opined that Claimant had no useful ability to function or would be unable to meet competitive standards related to all four abilities and aptitudes needed to perform skilled work.  (*Id.* at 609.)  She also opined that Claimant had no useful ability to function in three of five mental abilities and aptitudes needed to perform particular jobs.  (*Id.*)

In response to the question, "I[f] stress tolerance is an issue, what demands of work does this patient find stressful?", Dr. Rathe circled 18 of 22 "demands." (*Id.* at 610.)  Dr. Rathe opined that Claimant would miss more than four days of work per month

due to her impairments. (*Id.*) Dr. Rathe stated that Claimant "is socially anxious to the point of avoidance. Her only social contact is with family with whom she lives. It took months [indecipherable] to persuade her to see a therapist because of anxiety. Many medication trials have not lessened her anxiety." (*Id.* at 609.)

The ALJ found Dr. Rathe's opinion unpersuasive:

In May 2019, Ann Rathe, M.D., wrote a statement on the claimant's behalf (9F). Dr. Rathe had a treating relationship with the claimant and started seeing her in April 2016. Dr. Rathe opined that the claimant has been chronically disabled by anxiety and depression since she met her in 2016. A ruling of disability is left to the Commissioner. She stated that the claimant's depression made it impossible for her to sustain a normal daily routine. She also stated that the claimant is very socially isolated. The claimant stated that her only social contact is with family with whom she lives. The undersigned finds this opinion to be unpersuasive because it is inconsistent with and not supported by the longitudinal evidence of record. Notably, the opinion was written almost 2 years after the claimant's date last insured. And while Dr. Rathe did have a treating relationship with the claimant prior to her date last insured this opinion is not supported by the record during that period of time. It is not supported because the claimant was able to have a routine the [sic] claimant was going to the gym and exercising three times a week. This opinion is inconsistent with the record because the claimant was not socially isolated as Dr. Rathe had stated. Dr. Rather [sic] stated that the claimant only interacts with the family she lives with. In contrast, the record shows that the claimant went out to movies and hung out with friends. In addition, the record reveals that the claimant was able to sustain an interpersonal relationship with a boyfriend.

(*Id.* at 17.) Dr. Rathe's opinion will be evaluated using the same factors set forth in part III.B, *supra*.

Claimant argues that

The ALJ's focus on Ms. Steere's limited social activities provided no rationale for why other limitations, including limitations involving understanding and carrying very [sic] short and simple instructions and making simple work-related decisions were not accounted for, why her opinions concerning detailed instructions limitations were not accounted

for, or why Dr. Rathe's absences opinions were not accounted for. (*See* TR 607, 609, 610).

(Doc. 19 at 13.)  Claimant asserts that Dr. Rathe's opinions are supported by treatment notes in the administrative record.  (*Id.* at 13-15.)  The Commissioner responds that the ALJ's opinion is supported by substantial evidence in the record as a whole.  (Doc. 20 at 12-13.)  Claimant makes generic arguments about her symptoms and does not tie them to any of the ALJ's decisions.  I have attempted to place Claimant's arguments where they best align with the ALJ's decisions and the Commissioner's arguments.

### 1.   Supportability

"The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . ., the more persuasive the medical opinions . . . will be."  20 C.F.R. §§ 404.1520c(c)(1); 416.920c(c)(1).

#### a.   Analysis

Dr. Rathe wrote her opinion on September 3, 2019.  (AR at 611.)  There is no indication that she limited her opinions to the relevant time period.  In fact, the instructions for interrogatories did not ask her to do so, only asking her to, "Please answer the following questions concerning your patient's impairments." (*Id.* at 606.)  A sign that Dr. Rathe did not limit her opinions to the relevant time period is her response to the first interrogatory, which asks "Frequency and length of contact." (*Id.*)  Dr. Rathe responded, "Initial visit 4-13-16; . . . Last visit—8-15-19."  Dr. Rathe also lists prescribed medications in her opinion that Claimant was not taking on March 30, 2017, the last time she saw Dr. Rathe during the relevant time period.  (*Compare* AR at 462 AR at 606.)  Therefore, the ALJ properly noted the opinion was written almost two years

after Claimant's LDI. (*Id.* at 17.)[14] The ALJ also properly found that the determination of whether a claimant is disabled is a decision reserved for the Commissioner. *Despain v. Berryhill*, 926 F.3d 1024, 1027 (8th Cir. 2019) (whether a claimant is disabled or unable to work are "issues reserved to the Commissioner") (quoting *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010)).

### i. Whether Claimant has the Ability to Maintain a Routine

Claimant argues that Dr. Rathe's opinions are reasonably supported by objective findings during the relevant period. (Doc. 19 at 13-15.) Dr. Rathe opined that Claimant could not maintain a routine. (AR at 607.) Claimant argues that the record shows she did not do well in her attempts to finish her incomplete classes and could not formulate a daily routine. (Doc. 19 at 14 (citing AR 461, 467).) She asserts that the record clearly documents her motivation problems and difficulties completing schoolwork. (*Id.* at 13-14 (citing AR 461, 488).)

As discussed above, Claimant's lack of motivation appeared limited to the writing assignments required for her incomplete classes. Claimant successfully completed two semesters of graduate school, albeit one of those with a reduced course load, while experiencing the fluctuating symptoms that, unfortunately, are often the hallmark of mental impairments. *See Knepper v. Astrue*, No. 11-CV-4034-DEO, 2012 WL 4470773,

---

[14] The ALJ did not appear to rely on this as a reason to find Dr. Rathe's opinion unpersuasive and neither do I. I merely note the time disparity, as did the ALJ, to emphasize that Dr. Rathe made no attempt to limit her opinions to any period of time during her three-year treating relationship with Claimant and to properly limit his analysis to the period prior to Claimant's LDI. (AR at 17.) ("Notably, the opinion was written almost 2 years after the claimant's date last insured. And while Dr. Rathe did have a treating relationship with the claimant prior to her date last insured this opinion is not supported by the record during that period of time.").) *See Moore*, 572 F.3d at 525 (holding evidence from outside the insured period only useful in helping to elucidate a medical condition during the insured period). New evidence cannot concern deterioration of a previous medical condition after a claimant's LDI. *Id.*

at *9 (N.D. Iowa Sept. 27, 2012) ("It is a truism that mental disorders wax and wane in time."); *Nowling v. Colvin*, 813 F.3d 1110, 1123 (8th Cir. 2016) (claimant's symptoms waxed and waned during relevant time period). In addition, Dr. Rathe noted at least twice that Claimant worked out regularly during the relevant time period, which supports the ALJ's decision. (AR at 17, 482 (October 2016 (working out regularly); 491 (June 2016—goes to gym regularly).)

That being said, Dr. Rathe's treatment notes contain some support for her opinion that Claimant had at least not established a routine during the relevant time period, if not that she could not maintain one in a work setting. In July 2017, Claimant was bored. (AR at 488.) Although she knew she should work on her incomplete coursework, she was not motivated to do so. She was feeling "pretty good, but was bored," spent time learning to ride her new scooter, spent time with her niece and friends, needed a career goal, and was not anxious about applying for work. (*Id.*) Dr. Rathe noted that Claimant "lacks direction vocationally and has stalled academically [, but did]. . . . not get the sense that she [was] 'stuck' because of depressive symptoms. . . ." (*Id.* at 489.) Dr. Rathe encouraged Claimant to explore volunteer opportunities or part-time work to give her days structure. (*Id.* at 489.)

On February 16, 2017, Claimant reported to Dr. Rathe that she was feeling better, "more 'alive'" and able to concentrate in and participate in class. (AR at 467.) However, Dr. Rathe noted that "[i]t is really hard for her to formulate a daily routine—can't think past this appt, for example, and has no plans for the rest of the day." (*Id.*) On March 30, 2017, one week after Claimant presented to the emergency department and one day before Claimant's LDI, Dr. Rathe noted that the triggering event for Claimant's decompensation and trip to the emergency department was her failure to write a prospectus she needed to present to a panel of instructors for approval. (*Id.* at 461.) Claimant was supposed to meet with her advisor on March 23 and woke up feeling

overwhelmed, took clonazepam, went to sleep, and missed the meeting. (*Id.*) When she woke up, she watched the news and saw a story about the possible demise of Obamacare. (*Id.*) Fearing she would lose her insurance, she sent messages to her family saying she felt she had no other option than to commit suicide via carbon monoxide poisoning. (*Id.*) Her niece was concerned and took her to the hospital. (*Id.*) Claimant felt better a week later, especially because her niece "actually cared." (*Id.*) Claimant denied any suicidal feelings. (*Id.*) She attended class on March 29 and planned to meet with her advisor on March 31. (*Id.*)

These treatment notes show that Dr. Rathe was concerned that Claimant did not have a daily routine and that she encouraged Claimant to find ways to get structure into her life. Although the March 30 treatment note indicates that Claimant missed class and could not finish any work, I note that Claimant's assignment was to write a prospectus and Claimant does not like writing. This alone does not indicate that Claimant is unable to maintain a routine. The evidence on this issue is mixed.

### ii. *Whether Claimant's Only Social Contact was with Close Family*

The ALJ found that Claimant had contacts outside of her family, which was contrary to Dr. Rathe's opinion that Claimant limited her contact to immediate family. (AR at 17.) Dr. Rathe's own treatment notes belie her opinion. Dr. Rathe knows that Claimant lives with her father and adult sister. (*Id.* at 476, 502.) Dr. Rathe's treatment notes mention times when Claimant spent time with her niece and other friends. (*Id.* at 461, 464, 488.) As discussed above, Claimant also had a long-term on-again/off-again boyfriend that is documented in Dr. Rathe's treatment notes. (*Id.* at 479, 485, 491.) The evidence on this issue supports finding Dr. Rathe's opinion unpersuasive.

### iii. Whether Claimant's Cited Treatment Notes Support Dr. Rathe's Listed Clinical Findings

Claimant cites a series of treatment notes where Dr. Rathe stated that Claimant was tearful, sad, severely depressed and/or where Claimant reported suicidal ideations ("SI"). (*Id.* at 463, 465, 475, 481, 485, 495, 498.) In her interrogatories, Dr. Rathe was asked to describe the clinical findings that demonstrate the severity of Claimant's mental impairment. (*Id.* at 606.) Dr. Rathe stated the following: "Shera is usually sad, melancholy or flat/'blah' mood-wise. She is often tearful. She lacks motivation, energy, and cognitive sharpness. She is often suicidal, especially in response to family tensions or self-defeating/self-punitive thoughts." (*Id.*) Claimant appears to cite the treatment notes in support of this part of the opinion. I will address the treatment notes in chronological order.

While Claimant was tearful and sad during her May 12, 2016 appointment with Dr. Rathe and reported that she had SI that week, she also stated that she would not go through with any of the methods of suicide she contemplated, had no suicidal thoughts that day, and allowed Dr. Rathe to speak to her brother about having her father lock all the guns in the house. (*Id.* at 497-99.) Claimant had just broken up with her married boyfriend, who was the only person Claimant talked to about her depression. (*Id.* at 497.) She then tried dating another man who coerced her into having sex. (*Id.*) In September 2016, Dr. Rathe noted Claimant "is trying to disconnect from her boyfriend, with whom she broke up. They still talk a lot. Her worst moods come when she is grieving that loss; she can have passive SI as a result." (*Id.* at 485). Claimant had no SI that day. (*Id.* at 486.) By January 3, 2017, Dr. Rathe noted Claimant had been weighing suicide options. (*Id.* at 479.) As the ALJ noted, Claimant was very depressed and her appearance was disheveled. (*Id.* at 481). However, as discussed above and in the ALJ's decision, Claimant had suddenly stopped taking her Abilify sometime before

this appointment. (*Id.* at 479.) It appears that Claimant started experimenting with her medication dosages at the end of November 2016. (*Id.*) Dr. Rathe stated, "Shera is once again severely depressed, triggered by discontinuing Abilify. Although she has been quite suicidal over the last week, she has felt relief from these thoughts over the last 2 days and adamantly denies any intent to harm herself at this time." (*Id.* at 481.) On March 9, 2017, Dr. Rathe noted that Claimant was "very depressed and . . . having intermittent suicidal ideations triggered by negative self talk and catastrophic thinking." (*Id.* at 465.) On March 30, a week after Claimant spent the night in the emergency department, Dr. Rathe stated that Claimant was very depressed with prominent neurovegetative signs and recommended looking at ECT. (*Id.* at 463.) Claimant denied feeling hopeless and denied any SI on March 30. (*Id.* at 461.)

Although the ALJ did not cite every one of Dr. Rathe's treatment notes, he chronicled Claimant's depression and noted that Claimant's relationship with her boyfriend affected her mental health. (*Id.* at 14-16.) He also acknowledged that Claimant had SI when she was admitted to the hospital in March 2017. (*Id.* at 16.) That he did not cite the other times Dr. Rathe documented SI does not mean he overlooked them. The ALJ was not required to cite every piece of evidence in the record. *See Wildman*, 596 F.3d at 966 (an ALJ is not required to discuss every piece of evidence submitted) (citing *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998)). Importantly, "[a]n ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." *Id.* (bracket in original). The ALJ also noted that in January 2017, Claimant's emotional distress was exacerbated by family discord and cited Dr. Rathe's February 16, 2017 treatment note. (AR at 15 (citing AR at 467).) Therefore, to the extent Claimant asserts the ALJ failed to properly evaluate this part of Dr. Rathe's opinion, I find that argument to be without merit.

43

This evidence in Dr. Rathe's treatment notes related to SI is a mixed bag. Although SI is mentioned in the cited notes, Claimant discussed SI she claimed to have experienced between appointments with Dr. Rathe and those were usually tied to situational stressors, often related to her relationship with her boyfriend, as the March and September 2016 treatment notes cited by Claimant show. Although the January 2017 treatment note documents SI, that was tied to Claimant's depression caused by her abrupt discontinuation of her medication. (*Id.* at 481.) As the ALJ recognized, Claimant's mental health took a turn for the worse in March 2017 when she presented to the emergency department for SI. Although this episode of SI was also tied to situational stressors—school work and fear of losing her health insurance—Claimant reached out to her family when she was having SI and her niece took Claimant to the emergency department. In addition, although Claimant was stable when discharged, Dr. Rathe's March 30 treatment note shows that Claimant's mental health deteriorated in the last month of the relevant time period, although Claimant stated she felt better and denied any SI at that appointment. (*Id.* at 461.)

Dr. Rathe's opinion states that Claimant was "often" suicidal. (*Id.* at 606.) Claimant cited five treatment notes out of the twelve in the administrative record (*Id.* at 461-507) related to SI, one of which was clearly tied to improper medication. Although this is not strong evidence supporting Dr. Rathe's opinion, it cannot be ignored.

The evidence on this issue is mixed.

### b. *Conclusion*

I find that although Dr. Rathe's treatment notes provide mixed evidence, they weigh slightly in favor of giving her opinion more weight.

### 2. *Consistency*

"The more consistent a medical opinion[] . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion[] . . . will be." 20 C.F.R. § 404.1520c(c)(2); 20 C.F.R. § 416.920c(c)(2).

### a. *Analysis*

Claimant's cited treatment notes are again not ascribed to certain issues identified by the ALJ or couched as arguments. I have, again, attempted to assign the treatment notes to the ALJ's appropriate findings.

### i. *Whether Claimant has the Ability to Maintain a Routine*

Claimant argues that "[h]er motivation problems are apparent in the record and clearly reflected in her difficulty completing schoolwork. (Doc. 19 at 13.) For support, Claimant cites Ms. Ewald's April 25, 2016 treatment note, which states that Ms. Steere had impaired cognition due to problems with memory, focus, concentration and recall, and had self-doubt and low self-esteem. (AR at 304-05.) This was Claimant's second counseling session with Ms. Ewald. (*Id.* at 305-09 (April 11, 2016 initial intake form).) Claimant also cites Ms. Ewald's June 6, 2016 treatment note in which Claimant stated that although she had been feeling much better and had more energy, she was having trouble getting motivated to finish her incomplete school work. (AR at 296.) Claimant was also busy planning her niece's shower, had increased her self-care, and felt better about herself. (*Id.*)

The Commissioner contends that although Claimant asserts she cannot maintain a routine, treatment notes show that in March and May 2016, Claimant told ARNP Janel Thompson that she scheduled gym time every day. (Doc. 20 at 12 (citing AR at 327, 330 (has now made going to the gym part of her routine), 333 (getting up by 10:00 and going to the gym).) In addition, as the ALJ noted, Claimant started a "couch to 5K" program. (AR at 18, 330.)

As discussed above, Claimant's lack of motivation appeared limited to the writing assignments required for classes. Other treatment notes show that Claimant could maintain routines in other parts of her life, including working out and making long-term goals, such as starting the "couch to 5K" program and planning a shower. In addition, Claimant successfully completed two semesters of graduate school, albeit one of those with a reduced course load, during the relevant time period. This required a certain amount of both mental and physical discipline to not only complete the coursework, but also to attend class, lectures, study groups, other required meetings associated with her courses, even if the courses were online.

The evidence on this issue supports finding Dr. Rathe's opinion unpersuasive.

### ii. Whether Claimant's Only Social Contact was with Close Family

Claimant cites no treatment notes that she contends support Dr. Rathe's opinion that Claimant's only social contacts are with the close family members with whom she lives. Ms. Thompson noted that Claimant got out of the house routinely and saw her adult nieces "for friends and interactions" and that Claimant went out for Easter. (*Id.* at 330.) Claimant also talked to Ms. Thompson about her boyfriend, even though the relationship was difficult because of his commitment issues. (*Id.* at 15, 291, 293.)

The evidence on this issue supports finding Dr. Rathe's opinion unpersuasive.

### iii. Whether Claimant's Cited Treatment Notes Support Dr. Rathe's Listed Clinical Findings

Claimant cites treatment notes that she contends support Dr. Rathe's statement, "Shera is usually sad, melancholy or flat/'blah' mood-wise. She is often tearful. She lacks motivation, energy, and cognitive sharpness. She is often suicidal, especially in response to family tensions or self-defeating/self-punitive thoughts." (*Id.* at 606.)

Claimant notes that she was tearful during her intake appointment with Ms. Thompson when they identified old patterns from the way she was parented that kept her "feeling guilty and shameful all the time" and identified new ways of thinking to challenge automatic negative thinking. (*Id.* at 305.) On January 27, 2017, Ms. Danielson noted that Claimant had reported suicidal ideation on January 23, 2017 after a conflict with family members that occurred during a taper/switch from one medication to another. (*Id.* at 473.) She was feeling "a little better" by January 27 and felt she was making progress because she was able to leave her bed, whereas the previous week, she did not; she was not anxious about that day's appointment, even though the appointment was with a provider she did not know, in contrast to feeling anxious to meet with Dr. Rathe, whom she has met several times; she did not find showering or going to the grocery store to be big deals like they were the previous week; and the group work she needed to do for class did not feel as overwhelming as it did the previous week. (*Id.*)

In February of 2017, ARNP Stacia Danielson noted Claimant was "shabbily dressed with minimum hygiene, had gotten into a fist fight with her father over politics, had poor motivation, poor to fair judgment, and limited to fair insight. (*Id.* at 470-71.) Claimant only showered on days when she left the house. (*Id.* at 470.) Claimant went to her room then came downstairs to apologize and discuss the situation with her family. (*Id.* at 470.) Claimant's family thinks "all she needs is Jesus, yet she 'doesn't care to do that.'" (*Id.*) Claimant reported to Ms. Danielson that things were "kind of okay" with her family as of the appointment. (*Id.*)

Finally, Claimant notes that she presented to the emergency department stating she had planned use her car for carbon monoxide poisoning on March 23, 2017. (*Id.* at 397.) Claimant also reminds the Court that shortly after her LDI, she underwent ECT at Dr. Rathe's suggestion. (*Id.* at 80, 553.)

I find that these treatment notes do not support Dr. Rathe's opinions. While Claimant was tearful during her intake appointment with Ms. Thompson, that appears to be a reaction related to Ms. Thompson's pointing out parenting techniques that instilled feelings of guilt and shame in Claimant. Claimant "identified that it was good to see and understand and she [was] hopeful that she [could] change things. She note[d] 'this is good stuff.'" (*Id.* at 305.) As discussed, although Ms. Danielson noted that Claimant reported suicidal ideation on January 23, 2017, this was in response to a family conflict that occurred during a medication change. (*Id.* at 473.) In response, Dr. Rathe made changes to Claimant's medications. (*Id.*) Claimant had no suicidal ideations on January 27. (*Id.* at 474.)

The ALJ noted that in February 2017, Claimant's "emotional distress had been exacerbated by family discord, but that Claimant's mood was better than it had been. (*Id.* at 15.) As just discussed, the treatment notes support this finding. The ALJ also noted that Claimant reported she was bored when not in school, but feeling emotionally well and that Claimant's symptoms could have been exacerbated by situational stressors such as her relationship with her boyfriend. (*Id.* at 15 (citing AR at 292-93, 407).) In addition, the ALJ devoted over half a page of the decision to Claimant's varied mental health in March 2017, which resulted in a trip to the emergency department on March 23 and Dr. Rathe's poor assessment on March 30. (*Id.* at 16.) The ALJ noted, however, that throughout March, Claimant had not followed through with calling a counselor. (*Id.* (citing AR at 461, 464; *see also* AR at 467 (Feb. 16, 2017 treatment note making "calling a therapist" a goal for the week).) "Failure to follow a prescribed course of remedial treatment without good reason is grounds for denying an application for benefits." *Brown v. Barnhart*, 390 F.3d 535, 540 (8th Cir. 2004) (quoting *Roth v. Shalala,* 45 F.3d 279, 282 (8th Cir. 1995)).

Moreover, Claimant's arguments that the ALJ "provided no rationale" for why Dr. Rathe's limitations regarding understanding and carrying out very short and simple instructions, making simple work-related decisions, understanding and remembering detailed instructions, and the number of absences Claimant would have per month were not accounted for are without merit. (Doc. 19 at 13.) These limitations were listed on the stock checkbox form completed by Dr. Rathe and detailed instructions are limitations related to semi-skilled work, which is work above the unskilled work the ALJ found Claimant could perform. (*Id.* at 13-14.) Although very short and simple instructions and simple work-related decisions are limitations related to unskilled work, the ALJ was not required to "list each limitation identified by a specific medical provider and explain why it was not incorporated into the [residual functional capacity] findings." *Salih v. Colvin*, 2013 WL 1411694, at *2 (D. Neb. Apr. 8, 2013) (citing *Wildman,* 596 F.3d 959 at 966 ("[A]n ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered."). In addition, the RFC places severe limitations on Claimant's interactions with coworkers, supervisors, and the public; work-related decisions and judgments; changes in the general nature of work settings and tasks; pace of work; and nature of tasks. (AR at 13-14.) Therefore, the ALJ properly considered the limitations supported by the administrative record.

The Court's duty is not to reweigh the evidence in the record. *Vester*, 416 F.3d at 889. The fact that Claimant can cite some evidence supporting her position does not dictate a reversal on this issue. *See Kluesner*, 607 F.3d at 536 (explaining that the Court must consider both evidence that supports the ALJ's decision and evidence that detracts from it). The Court's task is merely to determine if the ALJ's decision is supported by substantial evidence on the record as a whole, an evidentiary threshold that the Supreme Court explained "is not high." *Biestek*, 139 S. Ct. at 1154.

The evidence on this issue supports finding Dr. Rathe's opinion unpersuasive.

### b. Conclusion

These factors weigh in favor of finding Dr. Rathe's opinion unpersuasive.

### 3. Conclusion

Although there is some evidence supporting Dr. Rathe's opinion, I find that the record as a whole supports the ALJ's decision. I recommend the District Court affirm the ALJ's decision on this issue.

## D. Whether the ALJ Properly Evaluated Claimant's Subjective Complaints

### 1. Relevant Law

When a claimant suffers from a severe impairment, but the impairment does not meet or equal a disabling impairment listed in the regulations, the ALJ "will consider the impact of [the claimant's] impairment(s) and any related symptoms, including pain, on [the claimant's] residual functional capacity." 20 C.F.R. § 404.1529(d)(4). This determination involves a two-step process in which the ALJ first decides whether the claimant has a medically determinable impairment that could reasonably be expected to produce the claimant's symptoms and then evaluates the intensity and persistence of the claimant's symptoms. *Id.* § 404.1529(b),(c). When evaluating the claimant's subjective complaints during the second step, the ALJ considers the objective medical evidence, the claimant's work history, and evidence relating to the following factors ("the *Polaski* factors"): (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) [the claimant's] functional restrictions. *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984); 20 C.F.R. § 404.1529(c)(3).[15] An ALJ is not

---

[15] The Code of Federal Regulations includes the additional factors of: (1) other treatment the claimant receives for pain relief; and (2) measures the claimant uses to relieve pain "(e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.)." 20 C.F.R. § 404.1529(c)(3)(v),(vi).

required to methodically discuss each *Polaski* factor as long as the ALJ "acknowledge[es] and examin[es] those considerations before discounting [a claimant's] subjective complaints." *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) (citing *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996)).

> Although "an ALJ may not discount a claimant's allegations of disabling [subjective impairments] solely because the objective medical evidence does not fully support them," the ALJ may find that these allegations are not credible "if there are inconsistencies in the evidence as a whole." [*Goff v. Barnhart*, 421 F.3d 785, 792 (8th Cir. 2005)] (internal quotations and citations omitted). We will defer to the ALJ's credibility finding if the ALJ "explicitly discredits a claimant's testimony and gives a good reason for doing so." *Wildman v. Astrue*, 596 F.3d 959, 968 (8th Cir. 2010) (quotation and citation omitted).

*Buckner v. Astrue*, 646 F.3d 549, 558 (8th Cir. 2011).

After considering the factors and evidence, the ALJ determines the extent to which the claimant's symptoms affect the claimant's capacity to perform basic work activities. *Id*. § 404.1529(c)(4). The claimant's "symptoms, including pain, will be determined to diminish [the claimant's] capacity for basic work activities to the extent that [the claimant's] alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Id*.

### 2.     *Claimant's Arguments*

Claimant argues that the ALJ did not provide sufficient reasons for rejecting her "reported limitations and especially her non-social functioning limitations." (Doc. 19 at 16.) Claimant asserts that she explained at the hearing that she felt she would never finish her master's degree because of her memory issues, not because of social functioning issues and that she could not do other work due to motivation issues. (*Id*. (citing AR at

51

47, 49).)  The ALJ and Claimant had the following exchange about whether Claimant would be able to return to school or what kinds of jobs she might want.

Q:     -- I'm paraphrasing the notation, but that this was just not a healthy environment for you to be in at the time.  Do you think that that's sort of an insight that maybe goes forward that maybe going back to finish your Master's is maybe not something that would be in the, in the cards for you?

A:     Not unless I was – yeah, I don't, it would be a really difficult.  It's not because of the environment.  I really, really enjoyed school and the topics; I was very passionate about them.  But, just I don't know, at this point, it sounds so hard to get back into that, and especially because I feel like I've had a lot of memory issues since then.  I would be worried about that.

Q:     Okay.  Okay.  All right.  I understand.  Let me ask you then sort of the reverse side of that coin as far as a question maybe, or at least maybe a different facet of that crystal, maybe it's not a flip of the coin or two-sided thing. . . .  So, I'm describing, or I'm attempting to describe, just a fictional job that's a low stress environment.  You don't have to teach.  You don't have to – you know, it's a -- , I'll refer to it as a no-brainer job.  It's a low stress job. . . . I'm trying to describe to you a low-stress job, however you would define a low-stress job.  Can you see yourself going to work in a low-stress job in the future?

A:     Currently, no.

Q:     So currently, no, not ever?

A:     If, if I could move – if my treatment would help me keep going on upward, maybe, like.

Q:     Okay.  Okay.  Is there any sort of job that would interest you going forward, you know, building houses with Habitat for Humanity or working with little kids, or  you know, I don't know, that's what I'm asking.

A:     Honestly, I  haven't had interest in anything, so it's – but maybe, yeah, I don't know.

Q:     Okay.  All right.  Thank you, ma'am.

(AR at 47-49.)

Claimant asserts that the ALJ did not fully develop the record "to a sufficient degree." (Doc. 19 at 16.) She reiterates her argument that the ALJ made the erroneous assumption that she had not sought mental health treatment after her LDI until 2019 when "Dr. Rathe's March 30, 2017, note explained that [Claimant] was going to undergo ECT with Dr. Zdilar, which [she] did pursue." (*Id.* (citing AR 80, 191, 193).) Claimant also asserts that the ALJ put too much emphasis on the periods of time when her symptoms were lessened and she could do more and failed to appreciate that the record documented a downward trend in her mental health:

[1]     She was not getting better,
[2]     She had consistent amotivation issues as explained by Dr. Rathe, was failing out of grad school for a master's degree even with significant accommodations and allowances,
[3]     She was not able to live independently, and
[4]     She eventually [had] more and more frequent suicidal ideation until, before her date last insured Dr. Rathe recommended "ECT" for her, which Ms. Steere did end up pursuing.

(*Id.* at 17 (numbering and capitalization added).)

### 3.     Analysis

The ALJ concluded that although Claimant experienced "some level of limitations," they were only to the extent described in the RFC. (AR at 18.) Although Claimant argues that she explained at the October 3, 2019 hearing that she felt she would never finish her master's degree due to memory issues and that motivation issues would prevent her from working, the colloquy Claimant had with the ALJ shows that Claimant was speaking in the present tense, and discussed memory issues and interest/motivation issues that had developed since she quit her graduate studies. (AR at 47 ("I don't know, at this point, it sounds so hard to get back into that, and especially because I feel like I've had a lot of memory issues since then."); 48 ("Currently no."); 49 ("I haven't had any interest in anything, so it's – but maybe, yeah, I don't know.").) *See Moore*, 572 F.3d

at 525 (explaining that new evidence cannot concern deterioration of a previous medical condition after a claimant's LDI.)  The ALJ noted that during the relevant time period, Claimant was bored when she was out of school and expressed interest in pursuing an internship with the Girl Scouts.  (*Id.* at 15.)  As discussed above, Claimant's motivation issues during the relevant time period were associated with her dislike of writing. Claimant completed two semesters of school after taking a break spring semester 2016, including spring semester 2017, which included the months of January through March 2017, which were her most challenging, mental health-wise.  (Doc. 19 at 11 (citing AR at 42, 80, 461).)

Similarly, I have already discussed Claimant's argument that the ALJ failed to sufficiently develop the record and the fact that the ALJ cited the treatment note stating the ALJ recommended looking at ECT as a treatment option for Claimant (AR at 553). (*See* part III.A, *supra*.)  In addition, although I found that the ALJ did not rely on Claimant's lack of treatment after Claimant's LDI as a reason to deny benefits, even if he had done so, that  single round of ECT treatments would still support the conclusion that there "was a significant gap" when Claimant did not receive mental health treatment from June 2017 until 2019.  (*Id.* at 16.)  Moreover, this case can be distinguished from *Ford v. Astrue*, cited by Claimant because here, contrary to Claimant's argument and contrary to the facts of *Ford*, the ALJ did not draw "erroneous inferences . . . from the record."  518 F.3d 979, 983 (8th Cir. 2008).  I therefore once again decline to accept Claimant's invitation to reweigh the evidence in the case.  *See Igo v. Colvin*, 839 F.3d 724, 730 (8th Cir. 2016) ("[W]e consider all of the evidence that was before the ALJ, but we do not re-weigh the evidence. . . .")

Although Claimant states that the ALJ failed to appreciate the downhill trend of her mental health during the relevant period, as discussed above, the ALJ documented the history of Claimant's mental health treatment beginning in March 2016, five months

before Claimant's onset of disability date, with citations to treatment notes from six different institutions. (AR at 15-16.) The ALJ devoted over half a page of his opinion to the critical months of January through March 2017 when Claimant experienced the most rapid decline in her symptoms. (*Id.* at 16.) In addition, although Claimant lives with her father and sister, Claimant does not cite evidence supporting her statement that she is unable to live independently, rather than that she lives with her family for financial or other reasons. Claimant had previously lived in a separate apartment on the property. (*Id.* at 42.) Finally, although the ALJ did not discuss every accommodation Claimant received at school, he acknowledged that Claimant took a semester off school due to depression and that graduate school stress was one of the problems that resulted in her suicidal ideations and trip to the emergency department in March 2017. (*Id.* at 15-16.) However, the ALJ noted that even this trip to the emergency department did not result in Claimant being admitted for inpatient treatment. (*Id.* at 16.) Again, the ALJ was not required to cite every piece of evidence in the record. *See Wildman*, 596 F.3d at 966.

In short, the ALJ cited evidence in the record that demonstrated that although Claimant suffered some limitations due to her impairment, she was able to maintain a social life and friendships with her adult niece and others; work out at the gym; finish graduate-level work that did not involve too much writing; and have a boyfriend, although that relationship was not necessarily a positive one for Claimant. (*Id.* at 14-16 (citations omitted).) The ALJ also recognized that Claimant did well when she was compliant with her medication. (*Id.* at 15.) Claimant even admitted being bored when she was compliant with her medication and had nothing to occupy her time. (*Id.*) The ALJ also noted that Claimant's increased symptoms could be tied to situational stressors because she experienced increased depression when she broke up with her boyfriend. (*Id.*) In January 2017, when Claimant was noncompliant with her medications, she was also upset about another breakup with her boyfriend. (*Id.*) The ALJ also recognized that at the end of

March, "[C]laimant's symptoms were exacerbated due to situational factors including relationship issues right before her [LDI]." (*Id.* at 16 (citing AR at 407 (emergency department treatment note discussing Claimant's devastation over her boyfriend's decision not to leave his wife, how she felt lied to, and "could not take it anymore").) As previously discussed, situational stressors cannot provide the basis for a disability finding. *Dunahoo*, 241 F.3d at 1040. Here, the ALJ acknowledged Claimant's limitations and crafted an RFC that accommodated those limitations after properly evaluating Claimant's subjective complaints. *See Guilliams*, 393 F.3d at 801 (RFC is what a claimant can still do despite her limitations).

### 4. Conclusion

I recommend the District Court affirm this part of the ALJ's decision.

## IV. CONCLUSION

For the foregoing reasons, I respectfully recommend that the District Court **AFFIRM** the decision of the ALJ.

The parties must file objections to this Report and Recommendation within fourteen (14) days of the service of a copy of this Report and Recommendation, in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Civ. P. 72. Failure to object to the Report and Recommendation waives the right to *de novo* review by the District Court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** this 22nd day of April, 2022.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa